Good morning, Your Honors. May it please the Court. My name is Joseph S. Porte. I represent the Petitioner. Ms. Zhang Feng, if at all possible, I would like to reserve three minutes for rebuttal. Petitioners before this Court after being denied political asylum, withholding of removal and convention against torture relief by both the IJ and the BIA. However, since the BIA affirmed without opinion, the only thing we have to look to for guidance is the IJ's decision. Now, the IJ denied basically on three different rulings. The first ruling was that the Petitioner did not credibly testify. Second, and it's also kind of bootstrapped upon the credibility, is that the Petitioner didn't meet her burden of proof. And finally, the IJ found that the Petitioner was resettled in the kingdom of Tonga. Now, I would briefly like to address credibility, because in my opinion, I don't believe there's record evidence supporting it. It was very terse. There wasn't very many specifically detailed instances of inconsistencies or anything that would rise within this circuit to support an adverse credibility determination. Primarily, the IJ cited that the Petitioner gave nonresponsive answers. But if you have a closer view of the record, it establishes that the IJ based it more on conjecture. He just simply didn't believe her. There was several instances cited in my brief and also by the Respondent's brief that there was some confusion, that there were straightforward, easy questions that weren't even addressed to the merits of the Petition or of her claim for asylum, and that the Petitioner was having some difficulty in answering the questions. Now, this circuit, if the testimony is not to embellish the claim, then it really has no basis in an adverse credibility determination. To, I believe, the issue before the Court that is more pressing, and I believe the reason it's before argument, is more for firmer settlement. And I will move to that issue because I, unless the Court has questions on credibility. I think that's the most important issue in this case. Is the firmer settlement, Your Honor? Whether the right of abode is tantamount to. Let me address that, please. Now, firmer settlement, and I'm reading the regulation, it says an alien is considered to be firmly resettled if prior to arrival in the United States, he or she entered into another nation with or while in that nation received an offer of permanent resident status, comma, citizenship, comma, or other type of permanent resettlement unless he establishes that this entry into the nation was a necessary consequence of the flight and persecution, that he remained in the nation only as long as was necessary to arrange onward travel, and that he did not establish significant ties in the nation. There's also another exception, but I don't necessarily believe it's applicable here. Now, I have two arguments on firmer settlement. The first argument is that the right of abode had no permanence attached to it. And I look up all the cases that the Respondents cited in their briefs and many of the cases in this circuit regarding firmer settlement. In all the cases in which the Court has found firmer settlement, there have been two components. The first component, there's been at least one component. Some have two. The one component that's present in all the cases is that the alien lived for an extensive period of time unmolested in the third country. The case that I've seen that has the shortest period was cited by the Respondent. It's a BIA case, actually. It's Matter of Fortales, 18 INN 239. In that case, the person was a Cuban citizen and went to Peru and was given some sort of refugee status there and lived there for one and a half years uninterrupted. That status was set to expire after two years and then they came to the United States and were placed into exclusion proceedings. All the other cases, Yang, that's cited by the Respondent, there's 14 years they lived in France. Cheo, which is a case from this circuit, three years undisturbed in Malaysia. DL, which is 20 INN Decision 409, there was six years undisturbed in Spain. Presently, and on this record, we have five days in the Kingdom of Tonga. After they went to the Kingdom of Tonga, they went to Singapore, Japan, and Thailand within a period of, it's not necessarily clear from the record, but it was clearly less than a month because they left in April and they returned to Hong Kong sometime in May. Now, all these were a necessary consequence of flight. But, however, I don't believe that the issue even needs, the Court doesn't need to even go to the exceptions in this case. Primarily, I don't believe there's firmer settlement. There's no ties to Tonga. There's only five days there. There was a right to abode. However, and while this petition has been on review and arguing it throughout the various courts, that Tongan document has ceased to confer any benefits. She can't go back to Tonga. And the removal order in this case is Tonga, alternatively China. There was no order of removal. What does the right to abode mean? What does that mean? Well, it's unclear, Your Honor, but if I could try and make an explanation of it, the right to abode means that you have a right to live there, that you have a right to stay there. Now, by its own definitions, the consulate, I believe, of the Kingdom of Tonga submitted a fax, and it's part of the record, and all the documents pertaining to that are contained at pages 261 to 262 of the record. Now, in those documents, it basically states that she, that the right of abode is qualified on certain happenstances. One of them is that the person needs to apply for discretionary permission to enter the country. So there are some restrictions placed there. We don't know how stringent those restrictions are because there's no evidence in the record, and the Petitioner has not tried to go back to the Kingdom of Tonga. We also know that this right to abode, and this is on page 262, there's a paragraph 29. It says, every passport issued under this part of the Act shall expire after five years from the date of its issue, and may be renewed for a further period of five years upon written application to the minister of, I can't read the next word, police, and upon payment of a fee prescribed by His Majesty, the next word is also legible, upon expiration of ten years from the date of its initial issue, every such passport shall be invalid and of no effect. There's no indication in the record that she had anything other than this restricted right to abode, that she had some sort of permanence after this temporary status expired. Now, it is a little bit, the record is a little bit empty on this subject. However, I still believe there's enough to find that there's no firmer settlement, primarily because of the short duration. Secondly, because it wasn't necessary, because her basic definition almost fits the exception, and so if we work almost backwards by applying the exception, we don't even meet the beginning definition and there's no firmer settlement. In any event, what we have here at the end of the day is a Petitioner who has been ordered removed to Tonga in China. Now she will be removed to China because Tonga will no longer accept her. And as I previously stated, the testimony is credible. This is a political dissident. She was in organizations in China. She has written articles here. They have a circulation of 5,000. They're placed in Chinese supermarkets. There's photographs of the Petitioner in the record protesting with signs against the Chinese government in front of the Chinese consulate in Los  Angeles. Let me ask you a question. Sure. When she received that right to abode document or passport, whatever it was, from Tonga, did she have to go? She was in Tonga. She had to go to Tonga to get that? It's a little bit unclear, but my assessment of the record is that she had some problems in China because of her democratic activities. She was smuggled into Hong Kong, which also supports the exception, because she was smuggled in. It was a necessary consequence of her flight. She goes to Hong Kong and through some Tongan office in Hong Kong, she applied to pay some fee, which is not determinable from the record, and received some sort of document. She went into Tonga, and I believe once she got into Tonga, although it's unclear, after a period of three, four, five days, she received the actual physical passport. And then at that point is when she left to try and find out where she would spend her remaining days since she was not going to be going back to China. Could she have remained in Tonga? Arguably, yes. Or did she need another document? Arguably, under what's in the record right now, yes, she could have remained in Tonga. However, given the circumstances that happened to her, I don't know if the Court should make her bear the brunt of whether she could or not. She was in fear. She was in the process of flight. She had not settled there. She had established no ties. But having left Tonga, at least the American consulate understands it to mean that in order to get back in, she would have to apply for some sort of discretionary permit to remain. Correct. The travel document or the passport or the ---- To remain, to go back into Tonga. That's correct. That's my understanding, and that is even the law that's been provided by the, that the Department of Homeland Security submitted at the hearing. It says that she will have to apply for some sort of discretionary approval prior to reentering. So the best you could say is that all that document does is allow her just to enter into Tonga. Subject to certain restrictions. She could remain there, but ---- She could remain there. Now, there's no indication in the record that we know that it's not permanent by its own definitions. We don't know whether it gave her the right to apply for residency. We don't know whether it gave her the right to own property, whether ---- I believe there's something in here that says something about employment eligibility. But the fact of the matter is this woman's in flight. She never settled there. So I don't think necessarily that it should be held against her. She's in flight. She's there five days. She probably doesn't ---- I don't know what they speak in Tongan, but assuming that she's from China, I doubt she speaks anything that they speak in Tonga. She's not very familiar with the laws. And she enters there briefly because it's the fastest way to, to look at this area of, of problems. I don't, I don't see how it gets to that. In any event, assuming that this Court would find that there is firmer settlement, there's three parts to the exception. The first one is that it's not, that it was a necessary consequence of his flight from persecution. Now, when the Petitioner first entered Hong Kong, the record at page 119 cites that she was smuggled in. There was, the judge tried to say in his decision that it was unclear whether she was smuggled in or not, but the Petitioner credibly and clearly testified that she was smuggled in, and there's nothing in the record to dispute that or to refute it. Second, the, the next argument is that she remained in that nation only as long as was necessary to arrange onward travel. Now, she did stay in there shortly to arrange onward travel to a final destination that at that point was unknown. I don't think we can charge a Petitioner that has suffered or that is fearful of persecution to have a itinerary tattooed on her arm as to where she's going to end up. She was essentially bouncing around until she found a place that she would be happy there. The record also states that, the record clearly states that that's precisely what she was doing. Now, the final one is that the person did not establish significant ties. The I.J. in his decision even specifically stated that albeit there are not significant ties here, made that finding, he just kind of glossed over the remainder of the two parts of the exception and never came to a decision on it. Let me ask you one last, I just have one last question. Sure. If we were to agree with you that there was not a firm resettlement here and we disagree with your assessment of the credibility determination, what are you asking us to do? What I'm asking you to do is two things. First, I would, I would, I would respectfully request that the Court remand to the Attorney General. And further elaborating on the questions the Court was posing during the last argument, the Attorney General would have discretion in a case like this because the attorney, the statute doesn't say shall like the asylum statute where it takes away the discretion from the, from the Board of Immigration Appeals. It would have to be remanded back to the Board. However, there's no adverse factors here that would take away from the discretion. There's no criminal convictions. If the testimony's credible, there's nothing adverse. There's a lot of documents in the file as well that corroborate or plight that the I.J. never mentioned in the adverse credibility determination. And I believe the case should be remanded for an exercise of discretion. And secondly, I believe this Court has power to issue withholding of removal and convention against torture relief. The latter two sources of relief would not require a remand because there's no discretionary component in it. If you meet the requisite burden, the case closed. I'd like to save the rest of my time for rebuttal, if at all possible, unless there's further questions. I don't have any more time, but I think I've finished around. Thank you. Good morning, Your Honors. My name is Larry Cody. I represent the Respondent, John Ashcroft, in this matter. Substantial evidence does support the immigration judge's ruling that petitioner is not eligible for relief from removal because she failed to present credible evidence to support her claims for asylum, withholding removal, and protection under CAT. And moreover, the fact that she firmly resettled in Tonga renders her statutory ineligible for asylum. I know there was some discussion as to the nature of her firm resettlement claim. However, this Supreme Court and other circuits have said that they're – and have found that there is firm resettlement in the absence of any sort of permanent status for an individual. And that's cited in the government's brief. It's Yi Chin Wu, which comes out of this circuit. And it's very – the Supreme Court is very clear in finding that firm resettlement in the absence of a durable grant of permanent residence. What we have in this case is an individual who saw and received status in Tonga. And she chose not to stay there and chose not to live there. However, for the six years she remained in Hong Kong, she relied on that passport. The Court takes a look at her – the copy of the passport. I believe it's on – it's in the record on page 304, it starts. Just after that, about 312. There's almost 100 stamps on her passport. She relied on that passport to remain in Hong Kong and to work in Hong Kong. That there establishes some ties to Tonga. Yes, she did not live there, but she was not restricted from living there. She chose not to live there. So counsel's claim that his client did not firmly resettle in Tonga is without merit and the record supports the judge's conclusion that she had firmly resettled in Tonga. So what is – so then what do you contend are the ties to Tonga? Just the use of the passport? The fact that she was there for five days? She was granted the – she was granted the – She was granted the document. Granted the document. Granted the right to abode there. She was in Tonga for five days. And she was granted the right to abode there. She chose not to stay there. Well, she granted this document and whatever status she had under this document. Right. I'm talking about ties. Ties to Tonga. The – the – I'm not talking about her ultimate – her decision to leave. I'm talking about what are her connections, her ties to Tonga. Your Honor, the regulation states that an alien is considered to be firmly resettled if, among other things, they get offered and are granted some sort of status from this other country. That's in 1208.15. Well, it has to be an offer of permanent residence. But the passport was going to expire. The I.J. even notes that. So how can that be permanent? Well, Your Honor, this court in Yang, which is also cited in the government's brief, also found firm resettlement in the case where, upon arrival in the United States, the alien's travel documents and authorization to return to France had expired. But what were the other facts in that case showing ties to – They were 12-year –  12-year residence. But there's nothing in the – They were talking about five days. There's nothing in the – in the regulations that require a certain amount of time to establish. But the cases seem to suggest that there has to be some amount of meaningful time. The amount – the discussion as to meaningfulness of the ties or the time there comes in when – comes in primarily when there's no sort of official status, Your Honor. It's used as a factor, one of many factors, to determine whether or not – even though this person may not have been, you know, in other cases, may not have been, you know, given a document from the government saying, here, you are a refugee in our country. It's cases that discuss the time element. You use time as one of many factors to rebut the government's presumption, which Chair requires, that the person is firmly resettled. But anyway, back to my question. Okay. It's the document or whatever status it conferred. Right. For five days. Right. And her use of the passport. Your Honor, yes. And that adds up to permanent resettlement from your perspective. Yes, Your Honor. And under the case law. Yes, Your Honor. Okay. I just wanted to make sure I had your position. Yes, Your Honor. And with regard to permanent settlement issues – it's closed for now. I'll go over to average credibility, if that's okay. With regard to average credibility, the government's position is that this record does not require the conclusion that – which Elia Zacharias tells us is the standard that Ms. Young did credibly testify. The immigration judge cited vagaries, inconsistencies, and implausibilities in her testimony. And those facts supporting that were cited and were mentioned in the immigration judge's decision. For instance, on page 33 of the administrative record, the immigration judge notes the back and forth between petitioner and government trial attorney regarding whether or not the Chinese officials were continuing to look for her in her testimonies on AR-123 to 124, where she starts off saying that, yes, her friends told her that the Chinese police were still looking for her. And then it gets down to the end of that little exchange and she says, no, they didn't tell me. I don't know. I got an email from my father later on. That goes to the heart of her asylum claim, whether or not the Chinese officials are continuing to look for her. Also – Well, you're talking about page 33 of the record. Well, the immigration judge cited that in his decision on page 33 when he was reviewing the facts. He cited what? She said that – she said there were visits to the mother asking the whereabouts by members of the police department. When passed by the court, she identified that she really had no idea how many visits had been made, and she was guessing as to who the individuals were that were making the inquiries. Right. And, Your Honor, that directly ties into page 123 and 124 of the record, which is the testimony that the I.J. summarized there. But what – And in that testimony – What is wrong or what's inconsistent? Your Honor, because if you go to where she actually testified there and step away from the – But I don't – it doesn't matter what she testified. What's wrong with her saying she really didn't know how many times they came if she was told there had been a number of visits? Your Honor, what – He doesn't say she testified at one point there were 10 visits, at another point there were 15. I find it inconsistent that she gives different numbers. He said that when she was pressed, she said she didn't know the exact number of the visits. But what – he failed to – he didn't word for word summarize her testimony there, Your Honor. But what that testimony was in her hearing was that she started out saying that her friends told her that they were looking for her. And by the end of the exchange, in that part of the testimony that the I.J. summarized there, she states that her friends were not the ones who told her. But that's not what he says. You know, we're reviewing his decision and he is supposed to specify the inconsistency or what it is that leads him to a finding she's not credible. Now, it's not enough to make a general statement and then say, well, if you go read the record, you'll be able to figure out what it is. I mean, you've gone and read the record and you say here's what the real inconsistency is. But he hasn't pointed out that inconsistency. Your Honor, the immigration judge cites – he cites other examples of inconsistencies between not only her testimony, but her testimony. Okay. So we'll get rid of that one and go on to the next one. Not necessarily, Your Honor. I think the government's position is still strong there, but since the Court is obviously rejecting at this point, the government feels that it would like to use some time to point out some of the other inconsistencies that are evident in the record that the IJ cites to. For example, on page 284, which is the page from her asylum application, she indicates that she was detained during – Well, let's start out with where it is in his report. What – what – Okay, Your Honor. That's page 32 of the record. Okay. I'm sorry, Your Honor. It's – it's page 30 of the record. It's the end of the paragraph at the top. It indicates that she said nothing about being detained, whereas her asylum application indicates that she was detained. Again, it goes to the heart of her asylum claim. Whether or not she was detained by Chinese police is certainly a matter to take into consideration for – for determining whether or not a person qualifies for asylum or has a past persecution and will find a fear of future persecution. Did he note this discrepancy with the application? He notes it there, Your Honor. No, but does he reference the application? He does, Your Honor. Please. On page 29 of the administrative record, when he's reviewing the application, he discusses Part C, Block 1 of the application. He says, Respondent stated additionally that she had been detained for one night for introspection.  in her testimony to the court. Your Honor, did my time expire. Thank you, Your Honor. If you have further questions, I'd be happy to entertain them. Otherwise, the government would submit on its briefs. All right, thank you very much, Kenneth. Thank you, Your Honor. Thank you both very much. The case just argued will be submitted. The next case for oral argument is Javed v. Ashcroft.
judges: Reinhardt, Wardlaw, Paez